INTERNATIONAL ARMAMENT CORP., et al., Appellants,

v.

Clifford Wayne KING, Appellees.

No. 13–83–084–CV.

Court of Appeals of Texas, Corpus Christi.

June 7, 1984.

Darrel E. Reed, Jr., Hutcheson & Grundy, Houston, for appellants.

Joe K. Longley, Austin, for appellees.

Before UTTER, KENNEDY and GONZALEZ, JJ.

## OPINION

UTTER, Justice.

This is a products liability case. This suit arose as a result of an accidental gun-

shot wound suffered by appellee and inflicted by a 12-gauge shotgun, which was imported and distributed by appellant International Armament Corp. (hereinafter IAC). Appellee originally brought suit against the manufacturer of the shotgun and appellants IAC and Oshman's, the retail seller. Only IAC and Oshman's have appealed the judgment of the trial court. In response to the special issues, the jury found appellants liable for appellee's injuries and awarded him actual and exemplary damages and attorney's fees totaling $1,799,053.60. We affirm.

In September of 1979, appellee purchased a side-by-side double barrel 12-gauge shotgun from Oshman's. This particular weapon was marketed by IAC under the brand name of "Star Gauge." The weapon was manufactured for IAC by a Spanish arms manufacturer. Appellant imported and sold several hundred of these shotguns in this country in both 12, 20 and 410 gauges over approximately a two-year period of time.

Shortly after purchasing the shotgun, appellee went hunting with a relative. He experienced repeated misfiring in the right chamber of the weapon. He did not, however, return the weapon to Oshman's, nor did he have the weapon inspected by a gunsmith. On November 24, 1979, appellee and several relatives took the subject shotgun and some other weapons to a relative's farm for target practice. Appellee's brother-in-law first attempted to fire appellee's shotgun. The weapon again malfunctioned. Appellee's step-father, who professed certain expertise in weaponry, then took the shotgun and inspected it. He first removed the shells from the chamber and inspected the firing pins and the receiver assembly. While his step-father was looking at the shotgun, appellee walked downrange from the firing line and set up some cans which were being used as targets and had been blown over by the wind. As appellee began walking back towards his step-father, the step-father completed his inspection of the weapon and reloaded the shells into the chamber. When appellee was two to four feet in front of his step-fa-

ther, his step-father closed the receiver on the shotgun. At that time, the weapon discharged from its left barrel. Appellee was struck in the left shin, just below the knee, and the majority of the load exited through his upper calf. It is undisputed that the safety was on at the time of the discharge and that appellee's step-father's hands were not on the trigger. As a result of the gunshot wound, appellee suffered some permanent loss of use of his left foot, plus permanent disfigurement.

In his trial pleadings, appellee sought to recover damages against appellants under strict liability theory for importing, distributing or marketing a shotgun that was unreasonably dangerous due to a defective design and for failure to warn appellee of said defective design. Appellee also sought recovery for breach of warranty of merchantability, quality and fitness for intended use. Appellee also sought recovery for negligence and gross negligence for appellant IAC's alleged failure to inspect or test the weapon. Finally, appellee sought recovery from appellants under TEX.BUS. & COM.CODE ANN. Sec. 17.41 et seq., (Vernon Supp.1984) of the Texas Consumer Protection—Deceptive Trade Practices Act.

Appellants, on appeal, do not contest the jury's findings in awarding actual damages but do contest the award of exemplary damages and attorney's fees.

In its first through fifth points of error, appellant IAC attacks the sufficiency of the evidence to support the jury's findings to Special Issues 9 through 15 and 17. In response to these issues, the jury found:

### Issue No. 9

That defendant IAC failed to give an adequate warning, at the time it sold the gun in question, of the danger that such gun could fire when on "safety" and with no engagement of the triggers.

### Issue No. 10

That such failure of defendant IAC to warn of such danger rendered the shotgun in question unreasonably dangerous as marketed.

## Issue No. 11

That such failure to warn of such danger by defendant IAC was an "unconscionable action."

## Issue No. 12

That such failure was a producing cause of the occurrence in question.

## Issue No. 13

That defendant IAC knowingly engaged in such unconscionable action.

## Issue No. 14

That the failure of defendant IAC to adequately warn of the danger that the shotgun in question could fire when on "safety" and with no engagement of the triggers constituted reckless, wanton and grossly negligence conduct.

## Issue No. 15

That such conduct by defendant IAC was a proximate cause of the occurrence in question.

## Issue No. 17

That $1,500,000.00 should be awarded against defendant IAC as exemplary damages.

In considering a "no evidence" or "insufficient evidence" point of error, we will follow the well established test set forth in *Glover v. Texas General Indemnity Company,* 619 S.W.2d 400 (Tex.1981); *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965); *Allied Finance Company v. Garza,* 626 S.W.2d 120 (Tex.Civ.App.—Corpus Christi 1981, writ ref'd n.r.e.); CALVERT, *No Evidence and Insufficient Evidence Points of Error,* 38 Tex.L.Rev. 361 (1960).

The first thrust of appellant IAC's argument is that there is no evidence or insufficient evidence to prove that appellant knew or should have known of the defect in the gun; and therefore, appellant IAC could not have acted knowingly or with conscious indifference as to the safety of the appellee. Appellant IAC's real argument here is that there is insufficient evidence to support the award of exemplary damages.

▆▆▆ The proper test for awarding exemplary damages is whether or not the evidence of appellant IAC's conduct demonstrates "that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it." *Burk Royalty Company v. Walls,* 616 S.W.2d 911 (Tex.1981); *Missouri Pacific Railway v. Shuford,* 72 Tex. 165, 10 S.W. 408 (1888); *Ford Motor Company v. Nowak,* 638 S.W.2d 582 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.). Generally, in order to recover exemplary damages, the plaintiff must show that the offending party acted intentionally or willfully or with a degree of gross negligence which approximated a fixed purpose to bring about the injury of which plaintiff complains. *Diesel Injection Sales & Service, Inc. v. Renfro,* 656 S.W.2d 568 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.).

▆▆▆ "What lifts ordinary negligence into gross negligence is the mental attitude of the defendant; that is what justifies the penal nature of the imposition of exemplary damages. The plaintiff must show that the defendant was consciously, i.e., knowingly indifferent to his rights, welfare and safety. Such conduct could be active or passive in nature." *Ford Motor Co. v. Nowak,* 638 S.W.2d at 593. The standard for awarding punitive damages in products liability cases in Texas is based on the traditional standard for such damages; that is, a finding of at least gross negligence; of reckless indifference or wanton behavior. *Burk Royalty Co. v. Walls,* 616 S.W.2d 911 (Tex.1981); *Ford Motor Company v. Nowak,* 638 S.W.2d at 593.

▆▆▆ In determining whether there is some evidence of the jury's finding of gross negligence, we must look to all of the surrounding facts, circumstances and conditions, not just individual elements or facts. *Burk Royalty Co. v. Walls,* 616 S.W.2d at 922. The existence of gross

negligence need not rest upon a single act or omission but may result from a combination of negligent acts or omissions, and many circumstances and elements may be considered in determining whether an act constitutes gross negligence. *Id.* A mental state may be inferred from actions, and all actions or circumstances indicating a state of mind amounting to a conscious indifference need be examined to decide if there is some evidence of gross negligence. *Id.* Evidence that appellant exercised some care does not preclude this court's finding some evidence to support the jury finding of gross negligence. *Id.*

The evidence favorable to the jury's finding of gross negligence is as follows: Russ J. Moure, Director of Engineering for appellant IAC, admitted that the safety system used on the weapon would allow the gun to fire if the trigger sear[1] malfunctioned. He further testified that, contrary to IAC's advertisements, the weapon was not assembled and finished with meticulous care nor were all the major internal parts completely machined nor were all the moving parts polished for smooth operation. Moure also testified that, at the time IAC considered marketing this weapon, they received a shipment of eight weapons from the manufacturer of which the first two were test-fired and were inspected completely, internally and externally. Thereafter, IAC conducted a complete breakdown inspection of two out of every twenty-five weapons which it received from the manufacturer. Mr. Moure further testified that, from the very beginning, IAC was aware that these weapons were not meticulously manufactured and contained cosmetic defects. These cosmetic defects were to the extent that 150 out of the first 700 guns received by IAC were rejected. Ultimately, IAC discontinued importing the weapons because of the continuing problems with cosmetic defects from the manufacturer. Appellee's expert, Charles Tedford, a gunsmith, testified that the parts in the offending weapon were of inferior quality and that the sear and hammers were

not manufactured properly. Dr. John Vance, a mechanical engineering professor at Texas A & M University, another expert witness testifying for appellee, also testified that the sear and hammers on the offending shotgun were very poorly manufactured. All three of the aforementioned witnesses testified that the type of safety design used in the weapon would allow it to fire when on safety, if the sear and hammers assembly were defectively manufactured.

 It is clear from this evidence that appellant IAC was aware from the very beginning that these weapons were poorly manufactured. It is also clear from the evidence that appellant IAC knew that these weapons, if they were not properly manufactured with this type of safety design, were capable of firing while the safety was engaged. Finally, appellee's expert, Charles Tedford, opined that appellant IAC's failure to inspect the internal parts of the weapon in question constituted a conscious indifference to the welfare and safety of its ultimate user. We would hold that the aforementioned evidence constitutes some evidence that appellant IAC was consciously indifferent to appellee's welfare and safety. We hold that there was evidence upon which the jury could base its finding of gross negligence on appellant IAC's part.

In so holding, we are aware that the two most recent Texas cases, in which punitive damages were allowed in a products liability case had considerable evidence of prior actual knowledge on the part of the defendant. In *Rawlings Sporting Goods Co., Inc. v. Daniels,* 619 S.W.2d 435 (Tex.Civ. App.—Waco 1981, writ ref'd n.r.e.), the evidence clearly showed that the defendant knew of the dangerous propensity of its product from the happening of the specific occurrence of which the plaintiff complained and yet took no steps to correct the defect or warn the plaintiff. Likewise, in *Ford Motor Company v. Nowak,* 638 S.W.2d at 593–594, the evidence clearly showed that the defendant had specific pri-

---

**1.** The catch that holds the hammer of a gun at cock or halfcock.

or knowledge of the defect in question from its own test results and from reports of occurrences of the same type accident of which the plaintiff complained. Again, the record established that the defendant made a conscious decision not to correct the defect or warn the user of the potential danger.

However, the Supreme Court's holding in *Burk Royalty Co. v. Walls*, supra, does not require a showing of actual knowledge of the condition or circumstances as a predicate for the finding of gross negligence.

■ The standard to date in this state for determining the culpable mental state to support a finding of gross negligence is set forth in *Burk Royalty Co. v. Walls:* "A mental state may be inferred from actions. All actions or circumstances indicating a state of mind amounting to a conscious indifference must be examined in deciding if there is some evidence of gross negligence." *Burk Royalty Co. v. Walls*, 616 S.W.2d at 922. We overrule appellants' points of error one through five.

■ In its sixth point of error, appellant IAC challenges the sufficiency of the evidence to support the jury finding of defective design. In *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61 (Tex.1983), our Supreme Court reiterated the test set forth in *Turner v. General Motors Corp.*, 584 S.W.2d 844 (Tex.1979) for determining a design defect in a products liability case. "The test requires balancing the utility of the product against the risk involved in its use in order to find that the design is unreasonably dangerous." *Kindred v. Con/Chem, Inc.*, 650 S.W.2d at 62. The Court then pointed out the test in *Turner* had been elaborated in *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743 (Tex. 1980), wherein the Court stated:

"The jury may consider many factors before deciding whether a product's usefulness or desirability are outweighed by its risk. Their finding on defectiveness may be influenced by evidence of a safer design that would have prevented the injury. [Citations omitted.] Because defectiveness of the product in question is

determined in relation to safer alternatives, the fact that its risk could be diminished easily or cheaply may greatly influence the outcome of the case.

... This feasibility is a relative, not an absolute, concept; the more specifically and economically feasible the alternative was, the more likely that a jury may find that the product was defectively designed. A plaintiff may advance the argument that a safer alternative was feasible with evidence that it was in actual use or was available at the time of manufacture. Feasibility may also be shown with evidence of the scientific and economic capacity to develop the safer alternative." *Kindred v. Con/Chem, Inc.*, 650 S.W.2d at 62.

Our review of the record indicates that substantial testimony was adduced that the trigger sear of the gun which inflicted the appellee's injuries was defectively manufactured. The testimony of Russ Moure, appellant IAC's Director of Engineering; John Vance, appellee's expert witness; and Charles Tediford, a gunsmith testifying for appellee as an expert, all testified that the particular shotgun in question had a defectively manufactured trigger sear. Essentially, all these witnesses testified that, because of a defectively manufactured trigger sear, the weapon would fire while the safety was engaged. For example, Charles Tediford testified some thirteen times during his direct examination that the weapon was defectively manufactured and, as such, was dangerous.

There is very little evidence in the record concerning the defective design of the shotgun. The only substantial testimony of defective design is the testimony of Dr. John Vance, a professor of mechanical engineering at Texas A & M University. Dr. Vance testified, in response to a question posed by appellee's attorney, that the shotgun was defectively designed because its safety mechanism restrained only the trigger and not the intervening mechanism between the trigger and the hammer. It was his opinion that the defect in the design

would allow the hammer to release even when the safety was engaged.

In comparison to the evidence of defective design tendered in *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61 (Tex.1983); *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743 (Tex.1980); *Turner v. General Motors Corp.*, 584 S.W.2d 844 (Tex.1979); *Ford Motor Company v. Nowak*, 638 S.W.2d 582 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.); and, *Rawlings Sporting Goods Co., Inc. v. Daniels*, 619 S.W.2d 435 (Tex.Civ.App.—Waco 1981, writ ref'd n.r.e.), the evidence in this case is indeed slight. However, we hold the evidence sufficient to support the jury's finding of defective design. Appellants' sixth point of error is overruled.

■ In its seventh point of error, appellant IAC argues that the award of exemplary damages should be overturned because of the appellee's allegedly improper final jury arguments. The standard for reversal of a case for improper jury argument was set forth in *Standard Fire Insurance Co. v. Reese*, 584 S.W.2d 835 (Tex. 1979).

In the case of improper jury argument, the complainant must prove a number of things. He has the burden to prove (1) an error (2) that was not invited or provoked, (3) that was preserved by the proper trial predicate, such as an objection, a motion to instruct, or a motion for mistrial, and (4) was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the judge.... There are only rare instances of incurable harm from improper argument. The complainant has the further burden to prove (5) that the argument by its nature, degree and extent constituted reversibly harmful error. How long the argument continued, whether it was repeated or abandoned and whether there was cumulative error are proper inquiries. All of the evidence must be closely examined to determine (6) the argument's probable effect on a material finding. (7) Importantly, a reversal must come from an evaluation of the whole case, which begins with the voir dire and ends with the closing argument. *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d at 839–840.

Initially, we note that appellants have failed to present us with a complete record in this cause by failing to include in the record a transcription of all of the jury voir dire. Absent a complete record, it is impossible for us to determine whether or not the alleged improper argument was invited. *Fountain v. Ferguson*, 441 S.W.2d 506 (Tex.1969); *Baucum v. Statewide Hot Shot*, 550 S.W.2d 156 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.).

■ Our review of the record discloses that, at every instance where appellants complained of improper argument, the statement was either withdrawn by appellee's counsel, or appellants' counsel's objection was sustained and the jury was instructed to disregard the statement. We find that the improper remarks were cured by the trial court's instructions or withdrawn by the attorney; therefore, we find no error. Appellants' seventh point of error is overruled.

■ In its eighth and ninth points of error, appellant IAC complains of the sufficiency of the evidence to support the trial court's award of exemplary damages and of the failure of the trial court to grant a remittitur. As a general rule, "the finding a jury will not be disturbed on grounds of excessiveness if there is any probative evidence to sustain the award." *Texas Construction Service Co. of Austin, Inc. v. Allen*, 635 S.W.2d 810 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.). We will not substitute our judgment for that of the jury unless the record indicates the jury was influenced by passion, prejudice or improper motive. *Armellini Express Lines of Florida, Inc. v. Ansley*, 605 S.W.2d 297 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.). Only if, after review of the evidence, we find the award is so excessive as to shock our conscience will we grant a remittitur. We find the jury award not tainted by any passion, prejudice or improp-

er motive, nor do we find it so high as to shock our conscience. Appellants' eighth and ninth points of error are overruled.

In their final two points of error, appellants complain of the action of the jury and trial court in awarding attorney's fees to appellee. As previously mentioned, appellee brought suit against appellants under alternate theories of recovery under TEX. BUS. & COM.CODE ANN. Sec. 17.41 et seq., (Vernon Supp.1984) of the Texas Consumer Protection—Deceptive Trade Practices Act (hereinafter "the Act"). Section 17.50(d) of the Act provides that each consumer who "prevails" shall be awarded attorney's fees. However, this section must be read within the context of the Act to mean each consumer who prevails in a cause of action brought under the Act shall be awarded attorney's fees. *Stuckey v. White*, 647 S.W.2d 35 (Tex.App.—Houston [1st Dist.] 1982, no writ). The question therefore is whether or not appellee obtained any recovery under the Act.

The only issue submitted to the jury germane to a recovery under the Act were Special Issues Numbers Five through Eight which found that the shotgun was unfit for its intended use and that such unfitness was a producing cause of the appellee's injuries. Section 17.50(a)(2) of the Act provides for recoveries for breach of express or implied warranty. Clearly, the findings of the jury constitute a finding that appellant had breached its implied warranty of fitness for the ordinary purposes for which such goods are used. TEX.BUS. & COM.CODE ANN. Sec. 2.315 (Vernon 1968). Therefore, the jury's finding that this breach of warranty was a producing cause of appellee's injuries is sufficient to sustain the award of attorney's fees. Appellant's tenth and eleventh points of error are overruled.

The judgment of the trial court is AFFIRMED.

1. The suit was brought in Matagorda County on the basis that Oshman's had a retail outlet there.

## DISSENTING OPINION

GONZALEZ, Justice, dissenting.

I respectfully dissent. In my opinion, there is no evidence to support an award of exemplary damages and attorney's fees.

The parties sharply disagree as to what the record shows. Appellants assert that the record shows that *appellee's shotgun* could fire while on safety with no engagement of the trigger *only* because that particular gun had a manufacturing defect. Appellee asserts that the record shows that his gun, *and other shotguns of the same design,* could fire while on safety without engaging the trigger *with or without* a manufacturing defect. Therefore, a more detailed explanation of the contentions of the parties and what transpired in the trial court is necessary in order to properly evaluate appellants' points of error.

In September 1979, appellee purchased the shotgun from one of the Oshman's sporting goods stores in Houston. The shotgun was manufactured in Spain by Armas Erbi S. Coop, and was marketed under the brand name "Star Gauge" in this country by International Armament Corporation (Interarms), a Delaware Corporation. In November 1979, appellee was severely injured in the leg in Marlin, Texas. This happened when the shotgun was accidently discharged as his father-in-law closed the breach while it was on safety.

Appellee filed suit against Interarms, Armas Erbi and Oshman's, alleging, among several theories of recovery, strict liability in tort for which appellee specifically pled that "The shotgun was unreasonably dangerous due to the defective design and/or manufacture of its cocking and safety mechanism and further defective due to the defective manufacture of the left sear and left hammer, all of which were, collectively or singularly, a producing, or alternatively, a proximate cause of the damages suffered and sustained by the plaintiff." Appellee also alleged liability under the Deceptive Trade Practices Act.[1]

Oshman's filed a plea of privilege to be sued in Harris County and thereafter filed a motion for

Though served through the Secretary of State's Office, Armas Erbi did not file an answer. Oshman's filed a general denial, and further answered that appellee was negligent in the use of the shotgun. Interarms also filed a general denial and also answered that appellee was negligent: (1) by failing to return his shotgun to Interarms for repairs after discovering that it was malfunctioning; (2) by failing to have the gun examined or repaired by a gunsmith after discovering that it was malfunctioning; and, (3) by continuing to use his shotgun after discovering that it was malfunctioning. Interarms also filed a cross-claim against Armas Erbi for indemnity and contribution.

After the jury was selected, appellee filed a trial amendment and alleged: (1) that Interarms knew that the shotgun could fire while on safety without engaging the trigger; (2) that it failed to warn potential users of this fact; and, (3) that this was an unconscionable action. After the jury argument, appellee filed another trial amendment alleging that the failure of Interarms to warn of the danger that the shotgun could fire while on safety and without engaging the trigger was gross negligence.

Before submission of the case to the jury, appellee abandoned its claim of a manufacturing defect, and the only product defect issues submitted to the jury were pertinent to claims of a defective design and a marketing defect (failure to warn).

In response to the special issues submitted, the jury found:

1. That the shotgun was defectively designed at the time it was manufactured by Armas Erbi;

2. That the shotgun was defective at the time it left the possession of Interarms;

3. That such defect was a producing cause of the occurrence in question;

4. That the shotgun supplied by Interarms and Oshman's was unfit for the ordinary purposes for which such shotguns are used;

5. That said unfit condition was a producing cause of the occurrence in question;

6. That Interarms failed to give an adequate warning at the time it sold that shotgun of the danger that such shotgun would fire when on "safety" and with no engagement of the trigger;

7. That such failure to warn by Interarms rendered that shotgun unreasonably dangerous as marketed;

8. That the failure of Interarms to warn of the danger was an unconscionable action;

9. That such failure was a producing cause of the occurrence in question;

10. That Interarms knowingly engaged in such unconscionable action;

11. That the failure of Interarms to adequately warn of the danger that the shotgun in question would fire on "safety" and with no engagement of the trigger constituted reckless, wanton and grossly negligent conduct;

12. That appellee was 33% negligent on the occurrence in question, and Interarms was 67% negligent;

13. That such conduct by Interarms was a proximate cause of the occurrence in question;

14. That appellee should be awarded $234,053.00 actual damages, $45,000.00 attorney's fees, $1,500,000.00 in exemplary damages against Interarms and $4,000,000.00 exemplary damages against Armas Erbi.

The trial court granted appellee's motion to disregard the jury findings as to his negligence and rendered a $1,799,053.00 judgment for appellee against appellants.[2]

substitution of counsel. The trial court overruled the plea of privilege on the basis that Oshman's waived its plea of privilege by invoking the jurisdiction of the court, that is, by not making such motion subject to the plea of privilege.

**2.** This case was tried prior to the Supreme Court decision in *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414 (Tex.1984).

On appeal, appellants do not challenge the judgment as to the award of actual damages but by legal and factual insufficiency complaints, appellants do challenge the way the case was submitted to the jury, the jury responses and the award of exemplary damages and attorney's fees.

## EXEMPLARY DAMAGES

Guns are inherently dangerous. *See* 94 C.J.S. Weapons § 28(a). It is obvious to most adults that they should be handled with great caution. The record shows that both appellee and his father-in-law were well aware of the potential danger of shotguns and prior to its use on the occurrence in question, both were aware that the shotgun had a malfunction. In this connection, there is no evidence that the Star Gauge shotgun is any more dangerous when compared to other models. It is therefore incredible to me that the majority has based liability for punitive damages on the basis that the supplier failed to warn the user of the danger of accidental discharge, particularly when there was no evidence that the Star Gauge models in general had a propensity to fire while on safety with no one engaging the trigger. *See* Restatement (Second) of Torts, Sec. 402, Comment j. (1965); *Blackwell Burner Co. v. Cerda*, 644 S.W.2d 512 (Tex.App.—San Antonio 1982, writ ref'd n.r.e.); *Dougherty v. Santa Fe Marine Inc.*, 698 F.2d 232 (5th Cir. 1983).

The common thread in the cases from all jurisdictions that have allowed punitive damages in products liability cases is that liability for exemplary damages depends almost exclusively on the degree of the defendant's prior knowledge of the specific defect of which complaint was made by the plaintiff.[3] The recklessness must be close to criminal and must be clearly established, and punitive damages will not be imposed unless it is shown the defendant authorized, participated in, consented to, or, after discovery, ratified the conduct giving rise to the damages. The evidence need manifest a deliberate disregard for human welfare.

In the case at bar, the record shows that *before* Interarms marketed Star Gauge shotguns in this country, they completely inspected and test-fired some shotguns of the same model. Furthermore, thereafter, two out of every twenty-five shotguns were similarly broken down and inspected. Many of the guns were rejected for cosmetic reasons, but none were rejected for manufacturing defects. Therefore, I disagree with the majority's conclusion that the record supports a jury finding that Interarms was completely indifferent to appellee's rights by consciously disregarding his rights, welfare and safety. This is particularly true since there is no evidence that Interarms was aware or should have been aware of any special hazards not ordinarily connected with shotguns. For these reasons, I believe that the majority has too broadly read our Supreme Court's holding in *Burk Royalty Co. v. Walls*, 616 S.W.2d 911 (Tex.1981), (which is not a strict liability in tort case). While I agree that the evidence of gross negligence may come from all of the surrounding facts, circumstances and conditions, *Id.* at 922, there must also be evidence that the conduct was *knowingly* committed by the defendant. "The plaintiff must show that the defendant was consciously, i.e. *knowingly*, indifferent to his rights, welfare and safety." *Id.* (Emphasis added.)

As the majority points out in its opinion, there is really very little evidence in the record even to establish a defective design. At most, the record shows that Star Gauge shotguns that are improperly manufactured may accidentally discharge. There is absolutely no evidence that appellants had any knowledge of said defect, and I do not believe that any such knowledge is implied in any of Interarms' actions, or should be implied from Interarms' inactions.

There are two recent decisions in this State wherein exemplary damages were awarded in a products liability case. In comparing these cases with the case at bar,

---

**3.** *See generally,* Annot., 13 A.L.R. 4th 52 (1982).

I find appellee's evidence of gross negligence totally insufficient. In *Rawlings Sporting Goods Co., Inc. v. Daniels*, 619 S.W.2d 435, 440 (Tex.Civ.App.—Waco 1981, writ ref'd n.r.e.), the evidence clearly showed that the defendant knew of the dangerous propensity of its product from the happening of the specific occurrence of which the plaintiff complained and yet took no steps to correct the defect or warn the plaintiff. Likewise, in *Ford Motor Co. v. Nowak*, 638 S.W.2d 582, 593–594 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.), the basis for the majority opinion was that the evidence clearly showed that the defendant had specific prior knowledge of the defect in question from its own test results and from occurrences of the exact nature of which the plaintiff complained, and that the record established that the defendant made a conscious decision not to correct the defect or warn the user of the potential danger.

Returning to the case at bar, the record only reflects that this particular design has been in existence for 104 years and has been used by manufacturers other than Armas Erbi, the manufacturer of the weapon in question. There is no evidence in the record that any other Star Gauge shotguns had ever fired while on safety without engaging the trigger. There is no evidence of any test results which indicate this propensity, nor is there any evidence of one single previous occurrence similar to the one which caused the appellee's injuries.[4] There is no evidence of any of the factors listed in *Turner v. General Motors Corp.*, 584 S.W.2d 844 (Tex.1979), and reiterated in *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 62 (Tex.1983) with which the jury was to weigh the utility of the product verses the risk involved in its use. There was no evidence that accidental discharges are less likely in any other design. In other words, there was no evidence of a "fix", that is that an alternative design existed *that was mechanically and economically feasible* and that such a safety (one which blocks the hammer rather than the sear) would in fact prevent more accidental discharges than the safety in the Star Gauge shotguns. Simply demonstrating that an alternative design is available (one that blocks the hammer) is not sufficient to establish that an existing design is defective. *Daberko v. Heil Co.*, 681 F.2d 445 (5th Cir. 1982).

Simply stated, there is no evidence of the aggravated element which raises appellants' conduct to gross negligence; that is, that appellants knew or should have known that this weapon could fire, in the manner in which it discharged and that appellants consciously and deliberately chose not to warn appellee of the known danger. Absent this evidence, there is no evidence to support the jury's finding that appellants' conduct was "reckless, wanton and grossly negligent" and that appellants' conduct was an "unconscionable action."

I am therefore of the opinion that the judgment of the trial court should be reversed and rendered that appellee recover only his actual damages.

---

4. In special issues numbers 9, 10, and 14, the trial court assumed a controverted fact when it spoke "of the danger that such gun could fire on 'safety' with no engagement of the triggers." The court in effect told the jury that it believed that such "danger" existed in all shotguns of a similar design, and that such "danger" was known to Interarms.